

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESSICA RIVERA,

                              Plaintiff,

          - against -

KILOLO KIJAKAZI,[1]
*Acting Commissioner of Social Security Administration*

                    Respondent.

**20 Civ. 2999 (PED)**

**DECISION AND ORDER**

**PAUL E. DAVISON, U.S.M.J.:**

## I.  INTRODUCTION

Plaintiff Jessica Rivera brings this action pursuant to 42 U.S.C. § 405(g) challenging the

decision of the Commissioner of Social Security ("Commissioner" or "agency") denying her

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  [Dkt. 1.]  This matter is before me on consent to jurisdiction by a U.S. Magistrate

Judge.  [Dkt. 18.]  Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R. Civ.

P. 12(c) to reverse the Commissioner's decision that Plaintiff was not disabled within the

meaning of the Social Security Act, 42 U.S.C. §§ 423 *et seq.*, and to remand the matter for

calculation of benefits or, in the alternative, for further administrative proceedings.  [Dkt. 16.]

The Commissioner filed a cross-motion for judgment on the pleadings to affirm the

Commissioner's decision and dismiss this action.  [Dkt. 25.]  Plaintiff filed a reply in support of

her motion on July 23, 2021.  [Dkt. 27.]  For the reasons that follow, Plaintiff's motion is

---

[1]      Kilolo Kijakazi is now the Acting Commissioner of Social Security and is substituted for
Andrew Saul as Defendant pursuant to Fed. R. Civ. P. 25(d).  No further action is needed to
continue this suit in accordance with the last sentence of Section 205(g) of the Social Security
Act.  42 U.S.C. § 405(g).

**GRANTED**, the Commissioner's motion is **DENIED**, and the matter is remanded for further administrative proceedings.

## II.  BACKGROUND

### A.    Procedural History

Plaintiff filed applications for DIB and SSI on February 8, 2017, alleging that she had been disabled since January 12, 2017.  [R. 66, 170-82.][2]  Plaintiff's applications were denied, and she requested a hearing before an Administrative Law Judge ("ALJ").  [R. 79-80, 89-90.] Plaintiff appeared before an ALJ on December 10, 2018 where she was represented by counsel. [R. 38-64.]  The ALJ denied Plaintiff's applications by a decision dated December 24, 2018.  [R. 10-25.]  The ALJ's decision became the Commissioner's final decision on February 11, 2020 when the Appeals Council denied Plaintiff's request for review.  [R. 1-6.]  Plaintiff timely commenced this action on March 13, 2020.  [Dkt. 1.]

### B.    Medical Evidence

Prior to the January 12, 2017 alleged onset date, Plaintiff underwent an echocardiogram on July 24, 2014.  The results were unremarkable in all areas.  [R. 751-56.]  On January 12, 2017, Plaintiff slipped on a wet surface in the lobby of her apartment and fell, fracturing the left side of her hip.  She was transported to Jacobi Medical Center.  [R. 290-91, 347.]  She was unable to walk after the fall but denied numbness, tingling and trauma to her head or chest.  [R. 290.]  Plaintiff reported that she was standing at height level when she slipped and fell.  [R. 294.] She was diagnosed with a stress fracture in her hip and left femur.  [R. 248-49, 252, 295.]

---

[2]     Notations preceded by "R." refer to the certified administrative record of proceedings relating to this case submitted by the Commissioner in lieu of an answer. [Dkt. 15.]

The injury required surgery, which was performed on January 13, 2017. Plaintiff had an intramedullary nail, essentially a metal rod, installed in her leg. [R. 296, 301-17, 326-27, 399-402, 758-94.] Plaintiff tolerated the procedure well and was transferred out of the operating room in stable condition. [R. 402.] Plaintiff stayed in the hospital after the procedure for five days. [R. 252-69, 294-300.] Her doctor noted that she required walking aids and that Plaintiff had difficulty standing as well as motor weakness. She tolerated the surgery well and was resting comfortably in bed. Her vital signs were stable. After the surgery, she was eventually able to ambulate with a walker and stand with assistance, but she had a slow gait. [R. 254.] She was seen by Dr. William Walsh who opined that Plaintiff was orthopedically stable for discharge, and Plaintiff was discharged on January 18, 2017. [R. 249, 265.] Upon discharge, she was prescribed a walker as medically necessary. [R. 266.]

Plaintiff stayed at Grand Manor Nursing and Rehabilitation Center, a residential physical therapy facility, from January 18, 2017 through February 1, 2017. [R. 507-716.] Plaintiff initially met with a social worker, Charmaine Thomas, as well as nurses Linda Idi and Antonnette Maxwell. [R. 705.] Upon admission, the reviewers noted diagnoses of a hip fracture, hypocalcemia, a vitamin D deficiency, central pain syndrome, a pulmonary embolism, constipation, and nausea with vomiting. [R. 612, 643.] During a January 19, 2017 examination, Plaintiff was alert and oriented and able to communicate her needs. [R. 563.] She reported pain. [R. 564.] At the time, Plaintiff's body mass index was 20.1. Plaintiff's hearing, vision and speech were unimpaired. [R. 565.]

Plaintiff also underwent an initial mental status screening. She was able to understand others and express her own ideas and wants. [R. 627.] She was able to identify the day of the

week and year but not the correct month. She could recall three out of three words. [R. 628.]
She did not exhibit any attention deficits, disorganized thinking, or an altered level of
consciousness. [R. 629.] Plaintiff stated she felt depressed and tired, that she had an irregular
appetite, and either that she was moving or speaking slowly, or she was feeling restless. [R.
630.] She had no hallucinations or delusions and no symptoms concerning violence or verbal
attacks against others or herself. [R. 632.] Plaintiff needed assistance walking, getting on and
off of a chair, dressing, toileting, and attending to personal hygiene. [R. 636-37.]

On January 19, 2017, Plaintiff met with Kathleen Riordan, a speech therapist, who
determined that Plaintiff had no swallowing or speech difficulties. Plaintiff also worked with
John Quintero, a physical therapist, and Glenis Ambatt, an occupational therapist, to improve her
ambulation and activities of daily living. [R. 706.] She continued to present as alert, oriented
and responsive throughout her stay, with no redness, drainage, or swelling at the surgical site.
[R. 707-16.] On January 20, Plaintiff needed assistance moving in and transferring from her bed,
as well as assistance toileting, bathing, dressing, and with personal hygiene. [R. 589-90.] On the
same day, Plaintiff was assessed with unspecified major depressive disorder, single episode. [R.
612.] On January 23, Plaintiff stated she felt helpless and reported difficulty sleeping. [R. 712.]
She was crying on January 25 after receiving a call from her son's school. [R. 714.]

Plaintiff was discharged on February 1, 2017. [R. 716.] Upon discharge, Plaintiff was
alert and oriented. She needed assistance bathing, attending to her personal hygiene, dressing,
preparing meals, and walking. She required a walker to ambulate. [R. 507.] Plaintiff could
occasionally rise from a seated position. Plaintiff's vision and hearing were not impaired. [R.
508.] The physical therapist remarked that Plaintiff could walk outdoors on uneven surfaces with

a roller walker. [R. 509.]  Plaintiff was discharged because her condition improved sufficiently

to allow her to return home. [R. 510.]

Plaintiff visited Urban Health Plan Inc. on February 3, 2017 following her rehabilitation

discharge. [R. 748-50.]  Plaintiff met with Dr. Tricia Downing who recorded that Plaintiff had

been in a car accident on January 12, instead of having fallen in her apartment lobby.  At the

time, Plaintiff reported that her pain was four out of ten.  Upon examination, Plaintiff was alert

and oriented and used a walker.  Her head, eyes, ears, nose, throat, skin, heart, and lungs were

normal.  Plaintiff had decreased right[3] leg range of motion due to pain, but no clubbing or edema.

[R. 748.]  A neurological examination was unremarkable with no focal signs.  Plaintiff was

assessed with left hip pain, for which she was prescribed medication. [R. 749.]

Plaintiff returned to Urban Health on February 13, 2017 and saw Dr. Jessica Braswell.

[R. 745-47.]  Dr. Braswell conducted a limited physical examination and observed that Plaintiff

was awake and alert, appeared well and well-nourished, was in no acute distress, and walked

with a walker and an antalgic gait. [R. 745.]  She determined that Plaintiff had an elevated

alkaline phosphatase level and assessed anemia, a vitamin D deficiency, and left hip pain.  [R.

745.]  On February 24, 2017, Plaintiff went to Urban Health Plan Inc. to obtain a transportation

form from Dr. Braswell.  She did not undergo an examination or assessment during this visit.  [R.

743-44.]

On May 12, 2017, Plaintiff saw agency consultative examiner Cheryl Archbald for a

physical examination. [R. 796-98.]  Plaintiff reported that she slipped and fell and had surgery in

January 2017, and that she experienced daily, constant pain since then.  She attended physical

---

[3]     The reference to Plaintiff's right, and not left, was likely a typographical error in the
report.

5

therapy but stopped due to lack of insurance. She stated she was unable to stand for too long due to left hip pain. Plaintiff could shower by herself but needed assistance dressing, and she spent her time watching television. [R. 796.]

Upon examination, Plaintiff had 20/20 vision in both eyes. She was in no acute distress. Plaintiff had a cane, which she stated had been prescribed by her doctor. Without the cane, Plaintiff walked with a slow, guarded gait and a mild limp. With the cane, she walked with a slightly decreased limp, but still had left-sided hip pain. Dr. Archbald opined that the cane appeared to be medically necessary. Plaintiff deferred walking on her toes. She was able to walk on her heels with difficulty. Her stance was normal. She did not need help changing for the examination or getting on and off of the examination table. She was able to rise from a chair using the cane. Examinations of Plaintiff's skin, lymph nodes, head, face, eyes, ears, nose, throat, neck, chest, lungs, and abdomen were all unremarkable. [R. 797.]

Plaintiff had full range of motion in her cervical spine. She had no scoliosis, kyphosis, or other abnormality in her thoracic spine. She had 45 degrees of flexion in her lateral spine, along with full extension, lateral flexion, and rotary movement. She had negative straight leg raising tests on the right side in the seated and supine positions. On the left said, Plaintiff's straight leg raising tests were positive at 20 degrees in the supine position and at 30 degrees in the seated position.[4] She had full range of motion in her shoulders, elbows, forearms, wrists, and the right

---

[4]      "The straight leg raise test 'checks the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression.' [G]enerally, in a straight-leg raising test, the patient is in the supine position with the knee and hip extended and there is passive dorsiflexion of the foot, where back pain indicates nerve root compression or impingement." *McIntosh v. Berryhill*, No. 17 Civ. 5403 (ER)(DF), 2018 WL 4376417, at *3 n.9 (S.D.N.Y. July 16, 2018), *report and recommendation adopted*, 2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018) (citing *Stedman's Medical Dictionary* (updated November 2014) available on Westlaw at STEDMANS 908450).

6

side of her hip. [R. 797.]  On the left side of her hip, Plaintiff had 50 degrees of extension, 20 degrees of interior rotation, and 25 degrees of exterior rotation. [R. 797-98.]  She had full range of backward extension, abduction, and adduction on both sides.  She had full range of motion of her right knee, but only 50 degrees of flexion and extension on the left.  Plaintiff also had full range of motion in both ankles.  There were no subluxations, contractures, ankylosis, or thickening, Plaintiff's joints were stable, and there was no redness, heat, swelling, or effusion. Plaintiff had pain on palpation on her left hip. [R. 798.]

Plaintiff's neurological examination was unremarkable with full reflexes, senses, and strength in all extremities.  Plaintiff had no muscle atrophy, cyanosis, clubbing, or edema.  Her hand and finger dexterity were intact, and she had full grip strength in both hands. [R. 798.]  An x-ray taken that day showed status post-ORIF ("open reduction internal fixation"). [R. 798-99.] Dr. Archbald assessed left hip pain, status post left hip surgery for fracture.  She opined that Plaintiff had mild limitations for walking, marked limitations for squatting, bending, and bending on her left knee, and moderate limitations for climbing stairs.  Dr. Archbald did not opine as to Plaintiff's ability to lift, carry, reach, sit, or perform fine motor movements or other postural activities. [R. 798.]

Shortly after the consultative examination, Plaintiff's medical records were submitted for agency medical review. [R. 65-78.]  However, Plaintiff's records were not reviewed by an agency medical expert and instead were reviewed by a non-medical, "single decision maker" who opined that Plaintiff was not disabled because, based on the single decision maker's opinion, Plaintiff's injury should heal within a year. [R. 75.]

Plaintiff returned to Urban Health on August 8, 2017 and saw Dr. Janette Torres for pain in her left leg. [R. 802-03.] Plaintiff was alert and oriented for a minimal physical examination which revealed no issues with Plaintiff's heart, lungs, abdomen, and pulses. Dr. Torres did not conduct a musculoskeletal examination but assessed leg pain, for which she prescribe ibuprofen. [R. 802.] She also administered a ketorolac non-steroid injection. [R. 802-03.]

On September 21, 2017, Plaintiff saw nurse practitioner Meral Duran for left hip pain and low back pain radiating to her legs. [R. 837-41.] Nurse Duran assessed radiculopathy in the lumbar region, left hip pain, and moderate recurrent major depressive disorder. [R. 837.] Plaintiff was prescribed opioid pain medication for her hip pain. [R. 838.] On examination, Plaintiff was not in distress and was oriented with good hygiene, judgment, and insight. Her thoughts and speech were normal. Her mood appeared normal and congruent with a bright affect and no signs of depression or anxiety. She was able to ambulate independently, but her gait was slow with mild difficulty. She had good balance, and she did not require any assistive devices for ambulation. [R. 839.]

Plaintiff had a functional range of cervical spine motion. She had a functional range of motion in her upper extremities with no signs of joint effusion, deformity, dislocation, subluxation, or contractures. She had normal muscle tone with no swelling or erythema. A neurological examination of her upper extremities was unremarkable. Plaintiff's range of lumbar motion was decreased in all planes, particularly with extension, and Plaintiff reported pain at the end of her range of motion. She also exhibited moderate muscle knots, firm muscle bands and soreness to palpation on the left lumbar paraspinal region. [R. 840.]

Plaintiff had a functional range of lower extremity motion with no signs of joint instability or subluxation. Her muscle tone was normal with no swelling, erythema, crepitus, or muscle atrophy, except in her left hip. Plaintiff had significantly decreased range of motion in her left hip, particularly with internal rotation with pain at the end range, without swelling or erythema. She also had diminished sensation at the L4/L5 and L5/S1 region. She had normal muscle strength in both lower extremities. [R. 840.]

On September 29, 2017, Plaintiff saw physician assistant Erika Wagner reporting a bruise on her right leg but denied pain. [R. 804-05.] An October 9, 2017 x-ray of Plaintiff's lumbar spine revealed mild dextroscoliosis with diffuse mild to moderate degenerative changes and no fracture. [R. 801.]

Plaintiff followed with nurse Duran on October 23, 2017. [R. 842-45.] Plaintiff reported low back pain that radiated to her legs. Nurse Duran assessed sacroiliitis, lumbar radiculopathy, and recurrent moderate major depressive disorder. She administered a trigger point injection in the lumbar region. [R. 842.] Plaintiff stated that physical activity, cold temperatures, walking, and prolonged sitting exacerbated the pain. Plaintiff's physical examination was largely unchanged from nurse Duran's prior examination. R. 843-44.]

Plaintiff attended a follow-up appointment at Urban Health for an annual physical on October 31, 2017. [R. 806-09.] On examination, Plaintiff was alert and oriented. Examinations of her head, eyes, ears, nose, and throat were within normal limits. Plaintiff's heart, lungs, and abdomen were unremarkable. Plaintiff's back appeared normal and straight and showed no evidence of scoliosis. Her skin and pulses were normal. Plaintiff had normal range of motion in

her extremities with no edema. A neurological examination was unremarkable with no focal signs or abnormality. [R. 807.] Plaintiff's BMI was less than 19. [R. 808.]

Plaintiff's next medical appointment was on February 5, 2018 at Urban Health where she met with nurse practitioner Amanda Scussel and requested a referral for physical therapy and treatment for depression. [R. 810-12.] Plaintiff was alert and oriented and appeared to be a healthy weight. She was assessed major depressive disorder with a single episode and left hip pain. [R. 810.]

Plaintiff attended a psychosocial evaluation with Lisa Alvarado, a social worker, on February 21, 2018. [R. 813-14.] Plaintiff reported prior mental health treatment for six months which stopped some years ago. Plaintiff denied suicidal and homicidal ideation as well as hallucinations. She appeared her stated age and was well-nourished and well-groomed. She was oriented and cooperative with good hygiene and normal psychomotor activity. She had no abnormal body movements, good attention, and was aware of her surroundings. She had a depressed mood with an appropriate affect. Her speech was normal. [R. 813.] Her thought processes were intact with unremarkable content. She had no perceptual disorders and had good insight and judgment. Ms. Alvarado assessed depression with anxiety. [R. 814.] Plaintiff attended another psychosocial evaluation with social worker Arvin Bains on February 27, 2018. [R. 815-17.] Plaintiff reported feeling anxious and deeply sad with periods of low energy. [R. 815.] She had a depressed, sad, and anxious mood with a constricted affect. Mr. Bains assessed anxious depression and encouraged Plaintiff to share her thoughts and feelings. [R. 816.]

Based on nurse Scussel's referral, Plaintiff began physical therapy at Physical Therapy of the Bronx on February 21, 2018. [R. 847-59.] At some point, Plaintiff completed a worksheet

describing her lower extremity functional capabilities. Plaintiff reported "extreme difficulty" with squatting and heavy lifting. She reported "quite a bit of difficulty" in her ability to engage in hobbies and recreation, performing light activities around her home, running, and rolling over in bed. She reported "moderate difficulty" performing her usual work activities, walking two blocks to a mile, and hopping. She had "a little bit of difficulty" getting into and out of the bath, putting on her shoes and socks, lifting objects like a bag of groceries from the floor, getting into or out of a car, going up or down a flight of stairs, and standing for an hour. She had "no difficulty" walking between rooms or sitting for one hour. [R. 847.]

Plaintiff attended physical therapy with Arthur Daniels. On March 24 and 26, 2018, Plaintiff underwent heat, ice, and electrical stimulation as well as hip exercises. She tolerated the session well and was making slow but steady improvement. [R. 852-53.] She continued treatment on April 4, 6, and 10, 2018, and Plaintiff stated she felt better with treatment. [R. 854-56.] On April 12, 2018, Mr. Daniels reported that Plaintiff had shown some improvement with decreased pain. Her active range of motion increased. Plaintiff could perform a straight leg raise from 0 to 45 degrees. She had 60 degrees of hip flexion, 30 degrees of abduction, and 30 degrees of internal and external rotation. She had 3/5 strength with pain, and Plaintiff's "LEFS" or "left extremity functional scale" increased to 40. [R. 857.] Plaintiff attended two more physical therapy sessions on April 26 and May 3, 2018, which she tolerated well. [R. 858-59.]

Plaintiff's next doctor's visit occurred on September 27, 2018 with Dr. Luis Gonzales at Urban Health. [R. 819-23.] Plaintiff reported panic attacks and restlessness for the past three to four months. [R. 819.] She also reported poor sleep, sad mood, irritability, anhedonia, and excessive worrying. [R. 820.] She stated she last saw a psychiatrist 13 years prior. [R. 821.] On

evaluation, Plaintiff was cooperative and appeared her stated age with good hygiene. She was oriented with normal psychomotor activity and attention. Her mood was anxious with a constricted affect. Her speech and thoughts were normal. [R. 822.] She had no perceptual disorders or suicidal or homicidal ideation, and she had good insight and judgment. Dr. Gonzales assessed anxiety and depression and prescribed Zoloft. [R. 823.]

On October 28, 2018, Plaintiff saw nurse Scussel at Urban Health for an annual physical. [R. 824-27.] Plaintiff was alert and oriented, and her physical examination was unremarkable throughout, including normal pulses and range of motion in all extremities. [R. 824-25.] She was assessed left hip pain, chronic headaches, and a BMI of 23.0 to 23.9. [R. 825.]

Plaintiff followed with Dr. Gonzales on November 1, 2018. [R. 828-29.] Plaintiff stated that the Zoloft was not helping, and she continued feeling depressed and anxious. On evaluation, Plaintiff appeared her stated age with good hygiene and normal psychomotor activity. She had a depressed mood with a constricted affect, no perceptual disorders or suicidal ideation. She had fair insight and good judgment. [R. 828.] Dr. Gonzales increased Plaintiff's prescription of Zoloft. [R. 829.] Plaintiff saw physician assistant Julio Cruz on the same day, reporting that she felt pain and cracking in her left hip. [R. 830-31.] A limited physical examination revealed pain in Plaintiff's left hip with ambulation, and she was referred to an orthopedist, Dr. Khaled Ahmed. [R. 830.] Plaintiff met with nurse Scussel again on November 11, 2018. [R. 832-36.] Plaintiff stated that she still felt pain in her hip, but the pain had lessened since her prior visit earlier in November, and she felt well otherwise. [R. 832.]

C.   **Testimonial Evidence**

1.   **Plaintiff's Functional Assessment**

12

Plaintiff completed an Adult Function Report on May 15, 2017. [R. 204-13.] Plaintiff stated that she would spend her time lying down and watching television. [R. 204.] She stated she was able to walk, stand, and work prior to her injury, but could no longer due to pain. She had difficulty dressing because she could not bend to put on her socks or pants. She had trouble bathing below the waist and shaving her legs. She could care for her hair and feed herself. [R. 205.] She was able to use the toilet but needed to hold onto the handrail. Plaintiff could not prepare food because she was unable to stand for long periods of time. [R. 206.] She could not perform house or yard work due to her inability to bend or walk. [R. 206-07.]

Plaintiff would leave her home only for appointments. She did not have a driver's license but could travel by car. She stated her cousin would do her shopping for her. [R. 207.] Plaintiff was able to count change, and her ability to handle money was not affected by her injury. Plaintiff liked to read and could talk with others, although she was unable to go outside. [R. 208-09.] Plaintiff stated she was unable to lift due to her knee. She could not stand or walk due to pain. She had difficulty sitting due to pain. She could not climb stairs, kneel, or squat. She had no problems reaching or using her hands. [R. 209.] She had no issues with her eyes, hearing, or ability to talk. [R. 210.] Plaintiff was right-handed. She needed a cane and walker to walk, and her walker was prescribed by a doctor. She stated she could walk for one block before needing to rest for six minutes. She had difficulty finishing tasks due to pain. [R. 210.]

Plaintiff stated she was able to follow written and spoken instructions, and she had no problems with people in authority. She stated that stress prevented her from performing daily tasks. Her pain began on January 12, 2017. [R. 211.] She described her pain as stabbing and aching. She felt pain in her left hip down to her toes every day caused by standing and walking.

13

At the time she was taking oxycodone, which would provide relief for a half an hour to two hours. [R. 212.] Her medication would cause drowsiness. [R. 213.]

### 2. Plaintiff's Testimony

Plaintiff appeared for a hearing before the ALJ on December 10, 2018, which she attended with counsel. [R 38-64.] Plaintiff testified that she last worked on January 12, 2017 as a receptionist at a medical office. [R. 43-44.] She tried to return to work for the same office but was unable to. [R. 44.] She stated that she was unable to continue working as a receptionist due to pain from walking, sitting, and standing, as well as anxiety from taking transportation. [R. 44-45.] Plaintiff's doctor discussed at-home exercises including leg lifts and performing internal leg rotations with a pillow between her legs, which Plaintiff stated would hurt after performing for ten minutes. [R. 45-46.]

Plaintiff lived on the fifth floor of an apartment building with an elevator. She lived with her three children who were 15, eight, and two at the time of the hearing. [R. 46.] Plaintiff's niece would come to her apartment during the day to help Plaintiff take care of the children. [R. 46-47.] Plaintiff testified that she needed a cane to walk, and she brought a cane with her to the hearing. She tried to stop using it but had to return to the emergency room, where she was instructed to keeping using it. [R. 47.] Plaintiff testified that she did not drive her children to school. Plaintiff's aunt would also help her take care of the children. When Plaintiff needed to attend doctors' appointments, her boyfriend would drive her. Plaintiff could not drive, and she never had a driver's license. [R. 48.] Plaintiff testified that she was unable to lift her two-year-old. She would sometime go to the grocery store with her boyfriend, but she would be unable to lift anything, which her boyfriend would do. She also would not be able to physically walk in the

14

store, although she would sometimes walk with him. Plaintiff received mental health treatment from Dr. Luis Gonzales. [R. 49.]

Plaintiff testified that she would not take her children outside, for example to the park. [R. 49-50.] She would not meet with her children's teachers at school and instead would only speak to them over the phone. Plaintiff received physical therapy for her hip, which she stated provided temporary relief. [R. 50.] She stated that her physical therapist did not discuss walking or putting more weight on her hip. [R. 50-51.] Plaintiff testified that she could only walk a half of a block due to pain and the feeling of losing blood circulation in her leg. She stated that the sensation would travel down her leg and calf on the left side. [R. 51.] These symptoms would occur when Plaintiff walked using her cane. [R. 52.]

Plaintiff testified that when she would go to the grocery store, her boyfriend would drive her. She would not be able to lift anything, for example a gallon of milk, and she would ask her son for help if she need a gallon of milk from the store. She would be able to lift up to a half gallon of milk from her refrigerator. [R. 52.] Plaintiff stated that she could stand for five minutes before experiencing pain. Plaintiff would normally stand without her cane, which she would use only when walking. [R. 53.] She testified that she could sit in a chair for half an hour to an hour at most, limited by pain in her sides and back. [R. 53-54.]

At the time of the hearing, Plaintiff took antidepressants and Naproxen, which caused drowsiness, and she also received a hydrocortisone injection for her back. [R. 54-55.] After Plaintiff's injury, she was hospitalized for four days and attended physical therapy for two weeks. She as assigned a home attendant for an additional two weeks, and she was prescribed a walker which she used for two and a half months. [R. 55.] She stated that the hospital recommended

that she use a cane. [R. 55-56.] Plaintiff testified that she could not take the subway because she could not climb up or down stairs. [R. 56.]

Plaintiff attempted to work in July 2018 but quit after one month. She attempted to work on a part-time basis from 10:00 a.m. to 3:00 p.m., but she missed five days of work and could not bear the pain, and on some days her boss would tell her to leave due to pain. [R. 56-57.] Since Plaintiff's onset date, she had not participated in church, volunteering, classes, or other regular activities outside of her home. [R. 57.] She would spend a typical day at home lying down or sitting. [R. 57-58.] Plaintiff testified that she also experienced symptoms from anxiety and depression, which would cause difficulties concentrating. [R. 60.]

### 3.   Vocational Expert Testimony

Mark Pinti, a vocational expert, testified at the hearing before the ALJ on December10, 2018. Mr. Pinti identified Plaintiff's past relevant work as a receptionist, a sedentary, semi-skilled job; a childcare worker, a medium, semi-skilled job; and a cashier, a light, unskilled job. The ALJ asked Mr. Pinti to consider a hypothetical individual limited to light work, and Mr. Pinti opined that that individual would be able to perform work as a cashier or receptionist, but not as a childcare worker. Mr. Pinti also testified that an individual limited to light work who needed a cane to walk but not to stand could work as a receptionist, but not as a cashier. [R. 59.] He opined that an individual limited to sedentary work who needed a cane to walk but not to stand could work as a receptionist. [R. 59-60.]

The ALJ asked Mr. Pinti to consider the same hypothetical individual but who could only perform simple, unskilled work. Mr. Pinti testified that this individual would not be able to perform Plaintiff's past relevant work. [R. 60-61.] Mr. Pinti then testified that such an

individual could perform the following unskilled, sedentary jobs in the national economy, as identified in the *Dictionary of Occupational Titles* ("DOT"): inspector, DOT No. 669.687-014; assembler, DOT No. 715.687-114; and document preparer, DOT No. 249.587-018. Mr. Piniti opined that the hypothetical individual would be able to perform those jobs even if they needed a cane for walking but not for sanding. [R. 61.] Mr. Piniti also opined that an individual who would be off-task for an average of 15 percent per day, excluding breaks and lunch periods, due to intrusive pain and difficulty concentrating, would not be able to perform these jobs, and that a worker who is off-task for more than 10 percent in a workday would not be able to productively keep up with the work. [R. 61-62.] Mr. Pinti opined that missing more than two days of work per month would also preclude working in these jobs. [R. 62.]

Mr. Pinti testified that if an individual needed a cane for standing, that limitation would impact their ability to perform the above jobs and eliminate their ability to do any work, even sedentary work, because the requirement to use a cane when standing would prevent an individual from using their hands while standing. [R. 62.] Mr. Piniti explained that even in sedentary work, for example as a document preparer or assembler, there are requirements to do a certain amount of walking and carrying objects. [R. 62-63.] Mr. Pinti opined that an individual who required a cane all of the time would not be able to work in the national economy without a special accommodation. [R. 63.]

## III.  LEGAL STANDARD

### A.    Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is even more deferential than the "clearly erroneous" standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (made applicable to Title XVI by 42 U.S.C. § 1383(c)(3)); *Shalala v. Schaefer*, 509 U.S. 292, 297 (1993); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). A remand for further proceedings may be ordered pursuant to the fourth sentence of 42 U.S.C. § 405(g) in cases where the Commissioner "has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the law and regulations." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (U.S. 1991); *see Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

**B.     The Five Step Sequential Analysis**

A claimant is disabled under the Social Security Act when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the Social Security Act only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

19

1.   The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.   If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.   If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.   If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.   If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the first four steps of the process. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his or her impairment prevents him or her from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See id.* At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

A claimant's "residual functional capacity" ("RFC") is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling ("SSR") 96-8p,

1996 WL 374184, *2 (July 2, 1996)).  When assessing a claimant's RFC, an ALJ is obligated to consider medical opinions on a claimant's functioning based on an assessment of the record as a whole. 20 C.F.R. §§ 404.1527(d)(2), 416.9527(d)(2) ("Although we consider opinions from medical sources on issues such as ...your residual functional capacity...the final responsibility for deciding these issues is reserved to the Commissioner.").  It is the Commissioner's role to weigh medical opinion evidence and to resolve conflicts in that evidence. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

C.    **Weighing Medical Evidence**[5]

When considering the medical opinion evidence, the ALJ must give deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the

---

[5]    On January 18, 2017, the Commissioner published the "Revisions to Rules Regarding the Evaluation of Medical Evidence," effective March 27, 2017.  82 FR 5844-01, 2017 WL 168819 (Jan. 17, 2017).  The Revisions altered certain longstanding rules for evaluating medical opinion evidence for cases filed after March 27, 2017.  *Id.* at *5844.  Plaintiff protectively filed her application on February 8, 2017, and, therefore, the Revisions do not apply here.

physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)-(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.") (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam)). As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

### D.    Remedy

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *Shalala v. Schaefer*, 509 U.S. 292, 297 (1993); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). A remand for further proceedings may be ordered pursuant to the fourth sentence of 42 U.S.C. § 405(g) in cases where the Commissioner "has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the law and regulations." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991); *see Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

Where the evidence shows overwhelming proof of disability, and no purpose would be served by a remand for a new hearing, the Court has the authority to reverse for calculation of benefits when the record provides "persuasive evidence of total disability that render[s] any

further proceedings pointless." *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 590-91 (S.D.N.Y. 2000).

Further, if the ALJ's decision is based upon an error of law and "where application of the correct

legal principles to the record could lead to only one conclusion, there is no need to require

agency reconsideration," *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (citing *Havas v.*

*Bowen*, 804 F. 3d 783, 786 (2d Cir. 1986)).  In such a case, a remand solely for the purpose of

calculating benefits is appropriate.  *Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998); *Parker v.*

*Harris*, 626 F. 2d, 225, 235 (2d Cir. 1980).

## IV.   DISCUSSION

### A.     The ALJ's Decision

At the first step of the sequential analysis, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since her January 12, 2017 alleged disability onset date. [R. 16.]  At

the second step, the ALJ identified Plaintiff's severe impairments as a left hip fracture and

degenerative disc disease and noted that Plaintiff had non-severe anxiety and depression. [R.

16.]  At the third step, the ALJ found that Plaintiff's physical impairments did not meet or

medically equal the severity of one of the listed impairments in the Adult Listing of Impairments,

20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), referencing Listings 1.02 for "Major

Dysfunction of a Joint" and Listing 1.04 for "Disorders of the Spine".[6]  [R. 16-17.]

Next, the ALJ assessed Plaintiff's RFC and determined that she could perform light work

as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), and that Plaintiff could lift or carry up to

20 pounds occasionally and 10 pounds frequently, stand or walk for six hours in an eight-hour

workday, and sit for six hours in an eight-hour workday.  The ALJ did not assess any mental or

---

[6]      In effect from May 22, 2018 to September 23, 2019.  Listings 1.02 and 1.04 were
subsequently removed.  *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

postural limitations. [R. 17-18.] At the fourth step, the ALJ found that Plaintiff could perform her past relevant work as a cashier, a light unskilled job, and a receptionist, a sedentary semi-skilled job. [R. 19.] The ALJ did not proceed to step five, but instead noted that the vocational expert testified that an individual with Plaintiff's age, education, work experience, and the above RFC could perform other work in the national economy, including as an inspector, a light unskilled job; an assembler, a light unskilled job; and a document preparer, a sedentary unskilled job. [R. 19-20.] As a result, the ALJ found that Plaintiff was not disabled within the meaning of the Act. [R. 20.]

**B.     The ALJ Failed to Develop the Record**

The ALJ has an affirmative duty to develop the record on behalf of all Social Security claimants, including those represented by counsel. *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009). The duty to develop the record is elevated when it concerns medical records from a claimant's treating source. *Shafer v. Colvin*, Case No. 16 Civ. 7941 (LAP)(SDA), 2018 WL 4233812, at *7 (S.D.N.Y. Feb. 15, 2018), *report and recommendation adopted*, 2018 WL 4232914 (S.D.N.Y. Sept. 4, 2018). "This is because treating sources 'are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) . . . that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Id.* (internal citations omitted).

To satisfy this duty, an ALJ should have medical evidence from treating physicians opining on the existence and severity of a claimant's disability, and "a record containing only treating physicians' raw data or medical notes is an insufficient record upon which an ALJ can substantiate an RFC." *Romero v. Commissioner of Soc. Sec.*, Case No. 18 Civ. 10248 (KHP),

2020 WL 3412936, at *12 (S.D.N.Y. June 22, 2020) (internal citations omitted). Remand is appropriate where the ALJ fails to discharge this duty, unless "'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual capacity,' rendering the failure harmless." *Id.*

Courts in the Second Circuit have held, as here, that an ALJ fails to satisfy this duty by relying on a record that contains only a single functional assessment, coming from a consultative examiner, without opinion evidence from treating physicians and without requesting opinions from treating sources. *See Romero*, 202 WL 3412936 at *13 (collecting cases). Here, the only functional assessment in the record came from Dr. Archbald, the consultative examiner who gave her opinion after a single examination. [R. 796-98.] None of Plaintiff's treating sources provided functional assessments, nor did the agency seek the opinion of an agency medical expert to determine Plaintiff's functional capabilities, relying instead on a non-medical single decision maker. As in *Romero*, the lack of relevant medical opinions from treating sources constitutes a gap in the record.

This error is not harmless because the record contained insufficient data from which Plaintiff's functional capabilities could be assessed. The record shows that Plaintiff had difficulty walking, had a metal rod installed in her leg after she fractured her hip, and required a cane to ambulate. [R. 296, 797.] However, the medical records contain no description of how much Plaintiff could stand or walk, but for Dr. Archbald's vague description that Plaintiff had "mild" limitations for walking. [R. 798.] *See Romero*, 2020 WL 3412936 at *15 ("When an ALJ has only treatment records and a vague functional capacity assessment from a single-

examination CE. . . the ALJ 'ha[s] an affirmative duty to develop the record and request that

Plaintiff's treating physician assess her RFC.'").

Additionally, Dr. Archbald declined to opine on Plaintiff's ability to lift, carry, sit, or

perform other postural activities. [R. 798.] The record contained no opinion evidence or

functional assessments describing Plaintiff's abilities to lift, carry, sit, or position herself.

Plaintiff stated that she was limited in her ability to lift and carry, for example having difficulty

carrying a gallon of milk, yet the ALJ did not seek medical records on Plaintiff's ability to lift.

[R. 52, 210.] The lack of any medical records or opinion evidence on Plaintiff's ability to lift,

carry, and position herself constitutes another obvious gap in the record.

The record also did not contain functional assessments of Plaintiff's mental capabilities,

which the ALJ acknowledged. ["The record is absent mental opinion evidence." *at* R. 16.] The

record shows that Plaintiff was diagnosed with depression and anxiety, and she received regular

mental health treatment, including medication and counseling, with Dr. Gonzeles and Ms.

Alvarado. [R. 810-23.] Yet the record contained no mental functioning assessments, either from

a treating source, a consultative examiner, or an agency medical expert. This, too, constitutes a

gap in the record. Accordingly, the ALJ failed to develop the record.

**C.     The RFC is Not Supported by Substantial Evidence**

The ALJ's determination that Plaintiff could perform the full range of light work was not

supported by substantial evidence. The full range of light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even though the weight lifted may be
> very little, a job is in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with some pushing and pulling
> of arm or leg controls. To be considered capable of performing a full or wide range

of light work, you must have the ability to do substantially all of these activities.
20 C.F.R. §§ 404.1567(b), 416.967(b).  The Commissioner's Social Security Rulings clarify that
"frequent" means occurring one-third to two-thirds of the time during an eight-hour workday.
SSR 83-10, Soc. Sec. Rep. Serv. 24, at *6 (S.S.A. 1983).  Additionally, "the full range of light
work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour
workday."  *Id.*

The ALJ's finding that Plaintiff could walk for six hours in an eight-hour workday and
that she had no postural limitations was unsupported by the medical record.  Plaintiff's physical
examinations showed consistent problems with her ability to walk.  Shortly after Plaintiff's
January 12, 2017 onset date, Plaintiff was prescribed a walker following her surgery.  [R. 266.]
Plaintiff reported pain with walking during physical therapy following the surgery.  [R. 564.]
Later that year, Dr. Archbald opined that Plaintiff's cane was medically necessary for
ambulation.  [R. 797.]  She also opined that Plaintiff had moderate limitations with using stairs
and marked limitations with postural activities, in addition to mild walking limitations.  [R. 798.]
Later records showed some improvement, but not to the extent the ALJ described.  By September
2017, Nurse Duran observed that Plaintiff did not need a cane to ambulate, but her gait was slow
and difficulty, and Plaintiff had decreased range of motion with pain.  [R. 839-40.]  Plaintiff still
required physical therapy over a year after her surgery, and those records showed continuing
limitations in her ability to walk.  [R. 847-59.]

These records demonstrate limitations in Plaintiff's ability to walk, but, due to the gaps in
the record, the exact extent of those limitations is unclear.  Nevertheless, these records do not
support the ALJ's finding that Plaintiff could walk six hours in an eight-hour workday.  The only

27

record on which the ALJ relied was Dr. Archbald's one-time assessment, however this reliance is specious. The ALJ ignored portions of Dr. Archbald's opinion that did not support an RFC for light work. For example, Dr. Archbald opined that a cane was medically necessary, and the ALJ rejected the portions of Dr. Archbald's opinion that showed limitations in Plaintiff's ability to squat, bend, and kneel. The ALJ also rejected Dr. Archbald's observations that Plaintiff deferred walking on her toes, could walk on her heels only with difficulty, and was limited in her ability to squat due to pain. [R. 18.] The ALJ is not entitled to "cherry-pick" evidence in this manner. *Annabi v. Berryhill*, No. 16 Civ. 9057 (BCM), 2018 WL 1609271, at *16 (S.D.N.Y. Mar. 30, 2018) ("[A]n administrative law judge may not 'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not.") (internal citations omitted).

Moreover, the ALJ failed to explain *how* Dr. Archbald's assessment supports a finding that Plaintiff could walk for six hours in an eight-hour workday. The ALJ remarked that Dr. Archbald's assessment was supported by "imagining that showed intact hardware," referring to a May 15, 2017 left hip x-ray. [R. 18, *referring to* R. 799.] How this x-ray, in combination with Dr. Archbald's opinion that Plaintiff had limitations in her ability to walk and medically required a cane to ambulate, translates to the ability to walk for six hours is unclear. There is simply no evidence in the record, and the ALJ cites none, that supports a finding that Plaintiff could walk for six hours in an eight-hour workday.

The ALJ's finding that Plaintiff could lift up to 20 pounds at a time and 10 pounds frequently is also unsupported. Plaintiff testified that, due to pain, she had difficulty lifting a gallon of milk, which weights approximately eight pounds. [R. 52.] *See Garcia v. Astrue*, Case No. 07 Civ. 6658 (DAB), 2009 WL 212405, at *4 (S.D.N.Y. Jan. 29, 2009). The record

demonstrates that Plaintiff's ability to lift is impaired, including physical therapy records showing difficulty with lifting objects like a bag of groceries due to pain. [R. 847.] On the other hand, the record is devoid of evidence showing that Plaintiff can lift up to 20 pounds, and the ALJ cites none. In fact, upon finding that Plaintiff met the lifting requirement for light work, the ALJ neglected to discuss Plaintiff's ability to lift whatsoever. [R. 17-18.] The ALJ's lifting determination, therefore, was not based on the medical record and was not supported by substantial evidence.

## V. CONCLUSION

For the forgoing reasons, Plaintiff's Motion is GRANTED, and Defendant's motion is DENIED. The Court remands this case for further administrative proceedings. The Clerk of the Court is directed to terminate the pending motions [Dkt. 16, 25.] and close this case.

Dated: July 27, 2021
     White Plains, New York

SO ORDERED

Paul E. Davison
United States Magistrate Judge